## Steiner Bros. *v.* Lowery & Co.

### *Trial of Right of Property in a Stock of Goods.*

1. *Considerations determining the bona fides of alleged purchase.*—In the trial of the right of property in a stock of goods levied upon by an attaching creditor and claimed by another asserting title by previous purchase in .consideration of the payment of an antecedent debt to the purchaser, the inquiry should be directed: (1) to the *bona fides* of the debt, (2) the sufficiency of the consideration, and (3) whether there was a reservation of a benefit to the debtor.

2. *Case at bar.*—Upon the facts appearing of record in the case at bar, *held:* that L. and A. J. Klein were both interested in the mercantile establishment sold to claimants, the Bernheim note, alleged to have been paid by claimants as a part of the consideration of their purchase was not *bona fide*, the value of the property purchased was materially greater than the consideration paid, and that there was a reservation of a benefit to the Klein brothers.

APPEAL from Jefferson Circuit Court.
Tried before the Hon. JAMES B. HEAD.

CABANISS & WEAKLEY, and WHITE & HOWZE, for appellants.—An insolvent may sell the whole or part of his property in payment of an antecedent debt and the sale will be upheld if the debt be *bona fide*, its amount not materially less than the reasonable value of the property and no use or benefit be reserved to the debtor.—*Hodges v. Coleman,* 76 Ala. 103; *Harmon v. McRae,* 91 Ala. 401; *Lehman v. Greenhut,* 88 Ala. 478; *Knowles v. Street,* 87 Ala. 357, and many other cases not necessary to be cited.

2. In such cases as this, the inquiries relate (1) to the *bona fides* and amount of the debt, (2) the value of the property and (3) the reservation of an interest or benefit to the debtor, and if the transaction be unassailable at these points it is impregnable.—*Carter v. Coleman,* 84 Ala. 256; *Lehman v. Greenhut,* 88 Ala. 478; *Chipman v. Stern,* 89 Ala. 207.

3. A sale of property by a debtor in failing circumstances will be sustained, so far as the· character of the considera-

[Steiner Bros. v. Lowery & Co.]

tion is concerned, against the attack of creditors, when it appears that the grantee has legally obligated himself to pay a debt due by the grantor to a third person, even though the debt had not been paid at the time of the attack.—*Mobile Savings Bank v. McDonnell*, 89 Ala. 434; *Harmon v. McRae*, 91 Ala. 401; *Harris v. Russell*, 93 Ala. 59; *Rankin v. Vanliver*, 78 Ala. 562; *Chipman v. Stern*, 89 Ala. 207.

4. While the burden of proof is upon the purchaser upon the questions of the *bona fides* of the debt and of the value of the property, the *onus* is upon the attacking creditor to show the reservation of a benefit to the debtor,—*Pollak v. Searcy*, 84 Ala. 259; *Roswald v. Hobbie*, 85 Ala. 73.

5. While it is true that the purchaser must show that he paid a measurably adequate consideration and while a gross disparity will avoid the sale, even not so gross as to shock the conscience, yet "the law will not weigh considerations in diamond scales" nor so closely balance property against price as to leave no room for the ordinary difference of opinion as to values.—*Mobile Savings Bank v. McDonnell*, 89 Ala. 434; *Chipman v. Stern*, 89 Ala. 207.

MOUNTJOY & TOMLINSON, for appellees.—1st. A sale of property, by an insolvent, in payment of an antecedent debt, as against an existing creditor of the seller, is presumed fraudulent; and if the purchaser fails to establish, by clear and satisfactory evidence, either that the debt was *bona fide*, or that the fair and reasonable value of the property was not materially greater than the debt: or, if from all the facts and circumstances of the case, it appears that any benefit was reserved to the seller,—the sale is void."—*Mobile Savings Bank v. McDonald*, 89 Ala. 435; *Lehman, Durr & Co. v. Greenhut*, 88 Ala. 480; Waite on Fraudulent Conveyances and Creditors Bill, 2nd ed., §§ 224, 241, 272; *Pritchett v. Pollock*, 82 Ala. 168; *Knowles v. Street*, 87 Ala. 357.

2nd. "If, in point of fact, either the debt is not *bona fide* or the goods materially greater than the amount of the debt, the utmost good faith and implicit belief on the part of both buyer and seller in such a sale that the debt was *bona fide*, and that the goods sold were not materially greater in value than the amount of the debt, will not validate the sale." *Mobile Savings bank v. McDonald*, 89 Ala. 447.

3rd. "Failure to take account of stock by purchaser; leaving sign the same after sale; employing vendor after sale; contradictory accounts of the sale by vendor and vendee; tendering security without solicitation; denying that inventory was taken; declining to show creditor of seller the

14-98

inventory; attempting to fraudulently swell the consideration; recited consideration different from that shown; failure to produce books in court but instead a transcript as to the alleged debt of L. Klein to A. I. Klein; all these *indicia* may be looked to in determining whether the transaction was in fact a bill of sale or only colorable and made for the secret benefit of the seller."—*Lehman, Durr & Co. v. Greenhut,* 88 Ala. 480; Waite on Fraudulent Conveyances and Creditors Bill, 340-1, 317; *Gould v. Williams,* 21 Maine, 273.

4th. The failure of Steiner Bros. to deduct money which L. Klein had on deposit with them from the debt of L. Klein to them, for which sale was made in payment, allowing Klein to check out the money afterwards, renders sale void.—*Harmon v. McRae,* 91 Ala. 401.

5th. If it appears from the record that there was sufficient legal testimony to support the decision of the lower court, the improper admission of testimony is error without injury. *Waldman v. North British Mercantile Ins. Co.,* 91 Ala. 170; *Brow v. Sullivan,* Ind. Appeal, 29 Northeastern Reporter, 453.

6th. An exception to the introduction of evidence will not be considered unless the records show that the ground of objection was specified.—Rule of Practice adopted by the Supreme Court, April 13th, 1891.

7th. "Fraud can generally be established only by facts and circumstances which tend directly or *indirectly* to indicate its existence."—Waite on Fraudulent Conveyances and Creditors Bill, pp. 316-7.

HARALSON, J.—This is a statutory claim suit to try the right of property in a stock of goods. The plaintiffs in the court below, J. S. Lowery & Co., the appellees, sued out an attachment in the Circuit Court of Jefferson county, on the 2nd of December, 1890, against L. Klein, and placing the same in the hands of the sheriff, caused it to be levied on a part of a stock of goods in a store house, No. 15 N. 50th Street, in Birmingham, Alabama, in which said L. Klein claimed to have carried on a clothing and furnishing store. Steiner Brothers, a banking house in said city, the appellants, interposed a claim to the goods levied on, claiming to have purchased them from said L. Klein, on the 28th of November, 1890. The claim suit, on issue properly made up, under the direction of the court, was tried by and before the circuit judge of that judicial circuit, without the intervention of a jury, the same having been waived by the parties. The

issue was found in favor of the plaintiffs against the claimants, and the property condemned to the payment of their judgment recovered against said L. Klein.

The plaintiffs proved their debt against the said Klein—about $7,000—and that it was contracted and existed, before the 28th November, 1890, the date of the alleged sale to claimants from said Klein.

In the trial of an issue of this character, as has been repeatedly held, the inquiry should be directed, (1) to the *bona fides* of the debt, (2) the sufficiency of the consideration, and (3) whether there was a reservation of benefit to the debtor. *Dawson v. Flash*, 97 Ala. 539; *Pollack v. Meyer*, 96 Ala. 172; *Hodges v. Coleman*, 76 Ala. 103. Our investigations will be made with reference to these decisive tests of the validity of this transaction.

The facts of the case, as set out in the transcript, are of voluminous recital, taken down, stenographically—questions and answers—just as they were propounded and answered by the witnesses, and we can do no more than to refer to such of the salient points, as lead us to the conclusion at which we have arrived.

The plaintiffs were merchants, doing business in the city of New York, and had been extending a liberal and generous credit to the concern trading in Birmingham under the name of L. Klein, or Klein, whether it was composed of one or more persons.

A. I. Klein was a brother of L. Klein, and came to this country many years ago from Austria-Hungary. He did business, as a merchant, in Greensboro, Alabama, prior to the year 1879, and in that year, failed in business. He knew the claimants, there, as early as 1875, and the proofs show, that their acquaintance has been intimate and friendly, though said A. I. Klein testifies to having met them a few times only, since. B. Steiner testified that he went to Klein's frequently; traded with him, was on good social terms with him; that their families visited; that he knew him in south Alabama where he failed, and that he knew as much about him as a man knows about one of his customers. It was also shown, that said A. I. Klein consulted with, and said Steiner advised him, about the composition and settlements of those old debts which were hanging over him. One can not resist the conclusion, on reading the evidence, that the parties were intimate, and that Klein's financial embarrassments and attitude as a trader, were well known to the Steiners. They were such, as that said A. I. Klein could not undertake—in advance of a settlement of his debts—to

[Steiner Bros. v. Lowery & Co.]

do business under his own name, and it is certain as circumstances can well make it appear, that he was doing business on his own account, under the name of his brother, L. Klein, as will presently very satisfactorily appear.

Within a short time after the failure of A. I. Klein in Greensboro, his brother, L. Klein, the defendant in attachment, came to this country from Austria-Hungary, bringing with him, as he swears, $2,000 which he procured to be changed into American money, in Bremen, and after his arrival in Birmingham, kept it in his trunk, and did not deposit it in any bank. We do not wonder, that he did not risk a bank with his money on his arrival, since he might not have known it would be safe; but, if he was cautious to take care of such possessions, as people generally are, it was contrary to the suggestions of safety, for him to have transported a sum of money so large and valuable to him, across the ocean and to Birmingham, on his person, or in his trunk, when it could have been done with no risk, and at little expense, by investing it in New York exchange. It was convenient, however, and perhaps necessary, in the trial of this cause, for him to appear to have had $1,500 in Birmingham, without any ear-marks at all, when he and his brother claim that he started a clothing and gent's furnishing enterprise in that place, in July, 1887. In March of that year, the said L. Klein and one Eisenberg bought out a clothing establishment from other parties, in which venture he invested $1,500. How much Eisenberg put in is not stated, but it is to be presumed, not a large amount. These parties immediately engaged the services of said A. I. Klein as manager and salesman, and in any other capacity in which his services might be required, at a salary of $2,500 a year, payable monthly, and this, notwithstanding the fact, they had a capital of only $3,000, (if each partner contributed an equal amount) with two partners, who for aught that appears, were capable of attending to the whole business, which did not exceed $20,000 or $25,000 of sales a year. This co-partnership arrangement lasted as might have been expected, only to the 15th of October, following, when L. Klein bought Eisenberg out, and the following very suggestive obligation was entered into by L. Klein with said A. I. Klein: "I hereby obligate myself and agree to pay Alex. I. Klein, for services to be rendered as herein stipulated, the sum of $2,500 per year, granting him the privilege to draw the same per month if he so desires, and further agree and obligate myself to pay said salary to said Alex Klein, every year for as long a term as it may prove mutually agreeable and satisfactory,

[Steiner Bros. v. Lowery & Co.]

and that I will, under any circumstances, protect him from loss of any balance due him at any time hereafter, until said Alex I. Klein may desire to quit his position with me. Signed and sealed this 25th October, 1887. L. Klein." In addition to this, L. Klein gave A. I. Klein a general power of attorney to take charge, manage and control said business, and he did so, in such manner as to impress those who dealt with him, and to create the belief generally, that he was the owner of the establishment. He bought the goods, sold them or had them sold under his direction, took out insurances, rented the store, and managed it as owner. The sign put up was "Klein" and "I. Klein." In his correspondence with J. W. England, the representative of plaintiffs, he speaks of "Kline," as *this firm,* the *firm of K.,* "the firm of L. K.," and uses in connection with it, the pronouns "we" and "us;" and in one of his letters, he explains the sign "K," and was not at all satisfied with it, and speaks of the time when "I can use my initials." In referring to his brother in that immediate connection, he says, "I can never afford to trust him on any business questions, as I do not find him competent, and that's the way matters stand and may remain so."

In September, 1890, L. Klein went to New York to effect with the plaintiffs an extension of their claim against "Klein." He says he saw Mr. Dixon, of the firm of plaintiffs, and asked him for an extension, and he was unwilling to give it. On returning to his hotel, he saw Mr. Sig. Steiner, one of the claimants, and asked him to go to Lowery & Co. and speak a good word for him, which he did, and afterwards, he arranged with Mr. Dixon; that while there, A. I. Klein sent him a statement to be used with plaintiffs, as a basis of credit, showing a total assets of $32,937.96, with total liabilities of $23,014.66, leaving balance of $9,923.96. In this statement he represented the stock on hand as $26,782.44, fixtures $750, safe $143, cash and papers $2,500, good accounts $3,680, merchandise bought since June, 1890, $5,313.65, and cash receipts, since that date, $8,801.39.

This statement was a remarkably good one for a business that had been in existence for about three years, starting on so small a capital. Having, through such a statement, and by the kind offices of one of the claimants, induced the plaintiffs to extend their claims through a period of twelve months, it requires explanation, such as we do not meet in the record, why it was that within about two months from that time, L. Klein should have sold out his entire possessions to the claimants to secure their debt to them of

[Steiner Bros. v. Lowery & Co.]

$6,412.37—$4,332.00 due, as claimed, to said A. I. Klein, which claimants agreed to pay.

Coming to this last transaction, the evidence of L. Klein shows, and that of the Steiners confirm it, (and besides them we are without any evidence on the subject) that the claimants, in November, notified L. Klein of his note of $1,000 maturing on the 1st of December. They sent him the usual bank statement to that effect. Thereupon, several days before the 28th November, 1890, Klein went and asked them for an accommodation for some money and also for an extension, and they informed him they could not let him have any more money, and desired him to pay the note that was nearly due. Klein informed them he did not have any money and could not get any, and proposed to them to take the stock for the money, which they agreed to do. The two Kleins are found, immediately following, taking and making out an inventory of the stock, which amounted to $17,082.76, and at the foot of this inventory is the following receipt: "Received of Steiner Brothers payment in full of the foregoing account, in consideration of which I hereby sell and assign the goods therein named and described to them, November 28, 1890. Signed, L. Klein." But, this receipt seems to have been unadvisedly given, and procuring the assistance of their attorneys, they had prepared and signed another agreement, executed by both parties, to the effect, "That party of the first part had bargained, granted and sold to party of second part," the goods in question, as shown by the inventory attached, at the price of $10,74 .37; "in consideration whereof, the party of the second part acknowledges the full payment to them of the debt due from said L. Klein to them, which is the sum of $6,412.37, and accept said goods in full payment thereof, and also agree to pay a certain note made by the said Leo. Klein, on the 26th November, 1890, payable to the order of A. I. Klein, at the banking house of Steiner Bros. on the 28th December, 1890, amounting to the sum of $4,332,—in all $10,744.37."

The same day this transaction occurred, the said Klein turned over to Mrs. A. I. Klein $1,500 worth of goods out of the store, in payment of an alleged indebtedness to her by him for that amount, and for an individual debt he owed England of $3,4 0, he transferred the goods at his branch store, inventoried at $3,300, reserving the notes and accounts due the house as his exemptions, on which he says he has collected only $800.

No reason is given, though called for by the plaintiff, why he did not transfer to A. I. Klein $4,332 worth of goods in

payment of his alleged debt to him, as he did to the wife of said A. I. Klein, to Steiners and England. But, the reason is obvious in the after transaction and dealing with Steiner Bros. as to this alleged debt. A conveyance of goods to pay that note could not have withstood the test of judicial enquiry on the attack of an attaching creditor, and its chances to run the gauntlet purporting to have been paid by claimants as a condition and consideration of their purchase, were deemed, no doubt, far more favorable, especially if it should appear, as they proposed to make it, that they paid without any knowledge of or participation in the fraud, if it should be shown to exist.

A. I. Klein claims that under the contract of L. Klein with him, L. Klein owed him, on a settlement made between them on the 26th November, that sum of money. A statement of that settlement was introduced in evidence, showing an indebtedness of $9,995.98, with credits reducing it to $4,337, as stated. This statement was made by A. I. Klein, and L. Klein shows he did not know whether it was correct or not.

The plaintiffs endeavored in vain to get the Kleins to produce the book of "Kline" in which this account was kept. They each stated that the account was on the book, and they produced the transcript, but were unable as they said to find the book from which it was taken, leaving very grave suspicion of its ever having been kept as stated by them on any book of accounts. As corroborative of such a suspicion, the fact appears that when A. I. Klein made out and forwarded to the plaintiffs in September, 1890, as a basis of credit, the statement of L. Klein's indebtedness, it did not contain any mention of this large debt.

A. I. Klein makes another incredible statement touching this transaction. He swears that he did not know that his brother was going to sell out to the Steiners. Yet, we find him engaged with his brother, taking an inventory at an unusual time, and at the same time we find him making out this great claim against his brother. Why should he have made it out at that time, and taken a note for the balance, unless he knew what was going on? And can any one be found to believe that he, who claimed to control, and who did manage the whole business, in which L. Klein, according to his representations, was a mere figure head, did not know what was going on between the Steiners and his brother? Besides, Leo Klein swears that when he gave him the note, he told him, according to his best recollection, that the Steiners would pay it.

Just at this point another very convenient actor appeared upon the stage,—one Bernheim,— the brother-in-law of A. I. Klein. The evidence tends satisfactorily to show that he was acquainted with what was going on; he was in attendance, around and about, as an interested participant. He had written to plaintiffs, on September 8, 1890, that if L. Klein succeeded in extending his debts with them, A. I. Klein had his assurance, and he would gladly lend him his support to meet those obligations. This proffer, together with the kindly offices of Sig. Steiner, had much to do, we may believe, in allaying the apprehensions of the plaintiffs, and preventing them taking steps which would have placed them in the front in an effort to recover their debt.

When A. I. Klein got this note from his brother, instead of taking it to the Steiners to pay, as his brother says he told him to do, and which note Steiners had given their obligation to pay, he says he sold it to Bernheim for $3,500, $1,850 in cash, and $1,650 for claims for cash that Bernheim says he let him have at different times, from April to July, 1890. It would seem that with a business so prosperous as A. I. Klein had represented to plaintiffs in September, this one was, with the amount of cash he was taking in, and with over $4,000 due him for wages, he would have been under no necessity of making a convenience of his brother-in-law. Yet he says, and Bernheim confirms the statement, that he lost $852.00 by transferring it to Bernheim. And another singular circumstance which cannot be explained, and which, of itself, characterizes this whole transaction is, that A. I. Klein, when he transferred the note to Bernheim, payable— not as the bill of sale, in the haste with which it was prepared, inadvertently states, on the 28th November, but—on the 26th December, 1890, endorsed the note, not without recourse, but so as to bind him; and when Bernheim carried it to Steiners, on the 28th November, instead of paying it according to obligation, they discounted it at one per cent. a month, which they required him to pay, or which he did pay in cash, by giving them a check on Moses Bros., of Montgomery; and Bernheim endorsed a note to them, and *waived protest on it*, and Steiners acquired it in a manner to make it binding on him, and they hold it to-day, from aught that appears, as an obligation on both A. I. Klein and Bernheim. And, inconsistent as all this is, we are met by that other contradictory fact, that Bernheim, when he discounted the note, says he did not need the money, and Steiner asked him to leave it there, which he did, on deposit without interest, so far as is shown, until the 7th of May—about six

months—before he drew it out. All this is utterly at variance with ordinary, open, fair and intelligible dealing. The only explanation that can be given to the transaction, as thus exposed, is that the note was simulated, and never intended to be real by either the Steiners, Bernheim. or the Kleins.

But, we weary in pursuing the details of this transaction. As much remains as has already been said, to show the invalidity of this sale. We hasten through, with but slight references to other phases of the evidence. Without discussing at length the evidence tending to show it, we feel safe in saying that the goods sold to Steiners, according to a fair interpretation of the evidence, were worth more than the consideration recited in the bill of sale. The judge who tried the case found they were worth $12,000. His finding is conservative, and we approve it. The Kleins inventoried the goods at $17,582.76, when they were preparing to sell to Steiners. When the sheriff levied on the goods and appraised them by competent men, the valuation put on them was $14,500. T. W. Smith, the deputy sheriff, J. W. England and E. C. Dickson testified, they were worth $14,500. M. Israel who occupied a part of Klein's store for about 18 months, who assisted in making the inventory, and who shows himself to be competent, estimated their value at fifteen or sixteen thousand dollars. After the claimants had executed their claim-bond and re-taken the goods, they had an inventory of their own, taken, showing their value to be $7,907.47, but the evidence shows that this valuation is too low, and it certainly is not as reliable as the one taken by the sheriff.

The Steiners claim, as a part of the consideration of said purchase, that they assumed and promised to pay certain small bills of Klein's, about town, amounting to $448.58, about half of which was for insurance premiums on policies taken out by Klein on the stock of goods, in October, 1890, to run a year. These policies, as was shown, were transferred to Steiners, but they are not mentioned in the inventory of goods, nor is anything said about them, or any part of this $448 claim, in either of the two bills of sale of the goods executed by Klein to claimants. After the sale to claimants, it was their business to insure their own property, and, if instead of allowing the old policies to lapse and take out new ones, they paid the premiums on the old, it was their debt and not Klein's, and this claim, so far as insurance premiums go, was certainly no part of the consideration of said purchase. The evidence shows, that when Steiners afterwards, disposed of the stock of goods to one Dreyfus,

he transferred these policies to him. The assertion of this claim favors an effort, merely, to bring the price alleged to have been paid, and the value of the goods, that much closer together.

After the sale to claimants, they employed A. I. Klein to close out the goods for them, at a salary of $2,500 a year. Having executed their claim-bond, and becoming re-possessed of the goods, they placed him in charge again, on the same pay. They transferred the goods to one Sol. Dreyfus, of Montgomery, the father-in-law of A. I. Klein, and he and D. S. Dreyfus and H. W. Bernheim, two of his brothers-in-law, also of Montgomery, in March, 1891, chartered what is called the Klein Furnishing Company, at the same old stand, and A. I. Klein was installed as manager and salesman, at the same old salary, and thus the transaction ends where it began. The incorporation of this company, is not of itself evidence of fraudulent combination between the parties. Consulting our general observation in reference to such matters, however, and taking it in all its bearings and surroundings, we are not prepared to believe, that the end is worse for the Kleins than the beginning.

There were, it may be added, striking inconsistencies, if not contradictions in the evidence of some of the more important witnesses examined for the claimants, as between themselves and between them and others, and an indisposition on the part of some of them, to answer some questions which were pertinent, and which it required the stimulating suggestions of the court to allay, all of which, are disparaging to the claimants and their cause.

Our conclusion is, that L. and A. I. Klein were both interested in the mercantile establishment which was sold to the claimants, and that this sale, when tried by the tests with which we commenced the investigation, can not be upheld. The *bona fides* of the Bernheim note, alleged to have been paid by claimants, as a part consideration of the sale, has not been established, and claimants are not, in respect to that claim, in an attitude of *bona fide* purchasers. The fair value of the property purchased was materially in excess of the real consideration paid for it, and in the transaction, there was a reservation of benefit to the Klein brothers.

The judgment of the court below is affirmed.

Affirmed.